OLIVETTI CORPORATION v. AMES BUSINESS SYSTEMS, INC.

No. 8526SC1129

(Filed 3 June 1986)

1. **Unfair Competition § 1; Fraud § 12— agreement to sell office products—unfair trade practice and fraud—evidence sufficient**

   The trial court did not err in an action for fraud and unfair trade practices arising from an agreement to sell office products by finding that Olivetti had made material misrepresentations and that Ames' reliance on such misrepresentations was reasonable where there was competent evidence supporting the court's findings that the representations were made, that they were both material and false, and that Ames' reliance was reasonable.

2. **Damages § 16.3— lost profits—new business rule—not followed—recovery allowed if lost profit shown with reasonable certainty**

   An office products dealer was not precluded from recovering damages from its distributor simply because the dealer did not have a past record of profits; North Carolina has never adopted the "new business rule" and apparently follows the view that recovery is allowed as long as the loss of profits is shown with a reasonable degree of certainty.

3. **Unfair Competition § 1— office products distributor—misrepresentations to dealer—evidence sufficient**

   There was sufficient evidence against Olivetti in an action by Ames for unfair trade practices to support the court's findings on damages that Ames could have become an NBI dealer in that NBI was interested in establishing a dealership in the area; NBI's eastern regional manager for dealer operations met with Ames' personnel; NBI's manager was impressed with Ames' personnel and thought that Ames could have been a good NBI dealer; although the manager testified that he did not make a formal offer, the testimony of Ames' personnel showed that Ames was told it could become an NBI dealer if it pur-

1

chased $25,000-$30,000 worth of NBI equipment; Ames decided not to become an NBI dealer based on the promises and assurances it had received from Olivetti and based on a purchase of additional Olivetti equipment made on Olivetti's misrepresentations; and Ames either had or would have had the financial capability to become an NBI dealer had it not been for Olivetti's misrepresentations.

4. **Unfair Competition § 1; Damages § 16.3— unfair trade practice—lost profits— measure not improper**

The trial court did not use an improper measure to determine lost profits in an unfair trade practice action between an office products distributor and dealer by basing the award for lost profits on the sales and service business which the dealer lost to a competitor because it passed up the opportunity to become an NBI dealer in reliance upon Olivetti's misrepresentations.

5. **Unfair Competition § 1— N.C.G.S. § 75-1.1 applied to distributor-dealer relationship—no error**

The trial court did not err in applying N.C.G.S. § 75-1.1 (1985) to the distributor-dealer relationship between Olivetti and Ames where the activities concerned were undoubtedly in commerce, Olivetti failed to show that it was otherwise exempt from the operation of the statute's provisions, and it was clear that individual consumers were not the only ones protected and provided a remedy by N.C.G.S. § 75-1.1 and § 75-16.

6. **Fraud § 12; Unfair Competition § 1— office products distributor and dealer— fraud and unfair competition—evidence sufficient**

In an action between an office products distributor and dealer, there was competent evidence to support the court's findings of fraud and proof of fraud necessarily constitutes a violation of the prohibition against unfair and deceptive acts. N.C.G.S. § 75-1.1.

7. **Unfair Competition § 1; Constitutional Law § 23.4— N.C.G.S. § 75-1.1 not unconstitutionally vague and overbroad**

N.C.G.S. § 75-1.1 was not unconstitutionally vague and overbroad as applied to an action between an office products distributor and dealer because the language of the statute provides adequate notice that conduct constituting fraud is prohibited.

8. **Fraud § 13; Unfair Competition § 1— damages—accounts receivable not offset —no error**

The trial court did not err in an action between an office products distributor and dealer by refusing to award to the distributor the full amount allegedly owed to it by the dealer on accounts receivable for equipment sold to the dealer where the court concluded that the equipment was purchased as a result of the distributor's fraud and unfair and deceptive acts and that the sale of the machines should be rescinded and the machines returned as a matter of equity.

9. **Unfair Competition § 1— damages—accounts receivable not deducted before damages trebled—no error**

The trial court did not err in an action between an office products distributor and dealer in which it had found that the distributor had committed an

Olivetti Corp. v. Ames Business Systems, Inc.

unfair trade practice by not deducting the distributor's accounts receivable from the damages awarded the dealer prior to trebling damages. N.C.G.S. § 75-16.

10. **Unfair Competition § 1; Damages § 16.3— unfair trade practices—damages awarded for some periods—not shown with sufficient certainty for others**

In an action between an office products distributor and dealer in which the dealer was awarded damages for certain periods for the distributor's unfair trade practices, the court did not err by not awarding lost profits or expenses for other periods where the dealer did not meet its burden of presenting sufficient evidence to permit the trier of fact to determine with reasonable certainty the fact and amount of those damages.

11. **Unfair Competition § 1; Damages § 17.8— unfair trade practice—damages trebled—punitive damages not awarded**

The trial court did not err in an action between an office products distributor and dealer in which the court found that the distributor had committed an unfair trade practice by refusing to assess punitive damages against the distributor in an amount greater than and in lieu of the treble damages awarded the dealer.

12. **Unfair Competition § 1— unfair trade practice—attorney fees not awarded—no error**

The trial court did not err in an action between an office products dealer and distributor by refusing to award reasonable attorney fees to the dealer pursuant to N.C.G.S. § 75-16.1 (1985). Award or denial of such fees is in the discretion of the trial judge.

APPEAL by plaintiff and cross-appeal by defendant from *Ferrell, Judge*. Judgment entered 3 January 1985 in MECKLENBURG County Superior Court. Heard in the Court of Appeals 12 March 1986.

In April 1982, Olivetti Corporation of America (hereinafter "Olivetti") instituted this action seeking to collect $148,990.68 plus interest allegedly owed to it by Ames Business Systems, Inc. (hereinafter "Ames"). Ames denied that it owed such amount to Olivetti and asserted as a counterclaim that Olivetti had committed willful and intentional fraud and unfair and deceptive acts and practices in violation of N.C. Gen. Stat. § 75-1.1 (1985) and thereby damaged Ames. Ames requested as relief that Olivetti recover nothing of it and that it be awarded actual, treble and punitive damages and attorney's fees.

A non-jury trial was held in May 1984 after which the court took the matter under advisement pursuant to the agreement of

the parties. On 3 January 1985, the trial court entered a judgment in which it found as follows in pertinent part:

1. Plaintiff, Olivetti Corporation of America, hereinafter "Olivetti," was, at the time of the transactions involved in this litigation, a wholly owned American subsidiary of a foreign holding company, which was itself part of the "Olivetti Group," controlled by an Italian parent corporation.

2. The business of Olivetti was, among other things, the sale of office products including typewriters, word processors and related equipment and supplies, through numerous dealers . . . and directly to certain large customers.

3. Defendant, Ames Business Systems, Inc., hereinafter "Ames," is a closely held North Carolina corporation formed in 1978 in Hickory, North Carolina to be an Olivetti dealer for accounting machines in certain nearby counties.

4. In March or April of 1978, prior to the formation of Ames, two of Ames' principals, Mr. James Nicholson and Mr. Wade Perry, discussed with Olivetti representatives . . . the formation of Ames as an Olivetti dealer. Olivetti's representatives promised that Ames would be a small local business with the backing of a giant corporation. Olivetti said it had a company-owned sales and service office in Charlotte and Olivetti promised to provide service, programming support and marketing support for Ames out of its Charlotte office. Ames was formed in April, 1978, based on these representations. Ames promptly entered into a dealership agreement with Olivetti. . . . Pursuant to this agreement Olivetti then sold Ames an opening order of approximately $80,000 of equipment, on credit.

5. In June, 1978, Olivetti announced to its employees that it would close its Charlotte office in August, 1978, except for the service department. The office was closed at the end of July, 1978.

6. Olivetti failed to provide programming and marketing support to Ames out of its Charlotte office after July, 1978, as promised to Ames in early 1978.

7. In August, 1978, Olivetti entered into a new dealership agreement with Ames . . . giving Ames the Charlotte

sales territory, as well as Hickory, and also providing that Ames would be its dealer for word processing equipment, as well as accounting equipment. Olivetti also amended its May, 1978 service contract with Ames . . . to include the new territory.

. . .

9. In the service contract, Olivetti promised to provide service to Ames and its customers for a period of two (2) years, in Ames' expanded geographical territory, for the equipment Ames was authorized to sell under its new dealership agreement. In February, 1979, Olivetti sold its service operation in Charlotte to Piedmont Business Systems, Inc., . . . a company formed by Mr. Rex Jones, Olivetti's former service manager. Olivetti assigned at that time Ames' service contract to Piedmont. Piedmont failed on several occasions during the remainder of the contract period to provide adequate service to Ames' customers, and this resulted in some damage to Ames, including a lost sale for a new word processor.

10. The dealership agreement between Ames and Olivetti is dated August 14, 1978. . . . [I]t appears to assign Ames several counties in North Carolina near Charlotte and Hickory, and to give an exclusive dealership to Ames for certain accounting and word processing machines in those counties. It also appears to state that . . . Ames releases Olivetti from all claims it has against Olivetti as of the date of the Agreement.

11. In August, 1979, Olivetti announced and promoted to Ames a new, sophisticated word processor, the TES-701. Olivetti's 701 product manager at that time, Mr. Gallagher, told Ames . . . that the machine was being purchased by Olivetti from NBI in Boulder, Colorado, under a five year supply agreement with NBI; and he guaranteed full software support, technical support and marketing support for the product for that period of time. This statement was false, as the agreement between Olivetti and NBI was not a five year agreement and could be terminated by either party at the end of 1980, upon giving notice prior to July, 1980. This fact was material, as it takes several months of effort for a dealer

to "get ready" to sell a product like the 701. Furthermore, customers and dealers are very reluctant to purchase a product like the 701 if they cannot be fairly assured of continued hardware and software updates and support. Customers realize that if the source of supply is not available, the support becomes unavailable also.

12. Based upon the false statements of Olivetti that it had a five year agreement with NBI for the 701, and the fact that the product was a good product, Ames purchased a demonstration 701 and proceeded to spend at least two-thirds of its time from August, 1979 through October, 1981 preparing to sell and attempting to sell the 701. In so doing, Ames concentrated its efforts on the 701 and slackened its efforts on other products in its line. Ames did so in reliance upon the false representations of Olivetti.

13. The agreement between Olivetti and NBI, hereinafter the "NBI Agreement," . . . was dated April 20, 1979. It provided for Olivetti to purchase 400 of the 701's in 1979 and 700 in 1980. . . . It provided for an initial term ending December 31, 1980, with automatic annual renewals unless either party notified the other party of its intention not to renew at least 180 days prior to the expiration of the term. . . .

14. At or about the time Olivetti announced the 701 product to Ames in August, 1979, Olivetti became concerned that its sales of the 701 were not keeping pace with its purchase commitments under the NBI Agreement and Olivetti attempted to postpone certain shipments of the 701 from NBI. . . . In early 1980 Olivetti was concerned with its inventory level and purchase commitments for the 701, and with whether it could sell the 701's it had in inventory if NBI did not renew the NBI Agreement for 1981. . . .

15. On or about July 17, 1980, Olivetti breached the NBI Agreement and refused to accept any further shipments of 701's from NBI. . . . At that time Olivetti had over 400 of the 701's in inventory, at a purchase price of approximately $5000 each, and was committed to purchase another 400 or more during the remainder of 1980. . . . This breach was committed by Olivetti despite its representations to Ames

that it had a five year supply agreement for the 701, and that it would support the 701 during that period of time.

16. On or about July 24, 1980, NBI notified Olivetti as a result of Olivetti's breach of the Agreement that it would not renew the NBI Agreement for 1980. . . . Between July 24, 1980 and September 15, 1980, Olivetti and NBI argued over the terms of the termination of the NBI Agreement. During that time, Olivetti asked NBI not to make any public announcement of the nonrenewal of the NBI Agreement.

17. On or about September 23, 1980, Olivetti's president confirmed a termination arrangement reached September 15, 1980 with NBI's president. In this arrangement Olivetti would accept from NBI 47 additional 701 systems already completed, but no more; Olivetti would pay a $300 premium per unit on each of the 379 units purchased in 1980 ($113,700); NBI would make no additional software options available to Olivetti except records processing, stat/math, tailorable communications and a diablo wide track printer. The parties specifically agreed, at Olivetti's request, that no public announcement would be made about these matters. . . . Olivetti never made a public announcement of the NBI termination.

18. In October or November, 1980, Ames heard, through a potential customer, a rumor that Olivetti had breached the NBI Agreement and that the Agreement had been terminated. The customer, Mr. J. S. Epley of Charlotte, was considering the purchase of a 701 from Ames, and had heard about these matters. Mr. Epley was disturbed, because he liked Ames and the 701 but did not want to purchase a 701 unless he could be assured of continued service, and support, including hardware and software updates. He conveyed the information and his concern to Ames; and Mr. Jay Ozment, Ames' salesman, telephoned Olivetti . . . to check on the rumors.

19. Mr. Ozment first talked about the matter with Mr. Gallagher, at Olivetti, the former product manager for the 701. Mr. Gallagher told Mr. Ozment there was no truth to the rumor and that everything was fine between NBI and Olivetti. Mr. Gallagher again stated that the Agreement with NBI was for five years, and said Olivetti was merely negotiating with NBI over price and systems updates. He then referred

Mr. Ozment to Mr. Geoffrey Kohart, the then-current Olivetti product manager for the 701. Mr. Kohart confirmed to Mr. Ozment that the rumors were false, and that Olivetti and NBI were merely negotiating over quantities to be shipped. Mr. Kohart agreed to write Mr. Epley a letter confirming these matters.

20. On or about November 26, 1980, Mr. Kohart, on behalf of Olivetti, wrote a letter to Mr. Epley . . . in which he failed to acknowledge that the parties had agreed not to renew the NBI Agreement for 1981, and falsely stated that the Agreement . . . provided for *software disks, supplies and technical support for five years.* . . .

21. As a result of Olivetti's misrepresentations, Mr. Epley purchased two 701's from Ames in December, 1980, and Ames borrowed some $46,000 from Mr. Wade Perry and purchased five 701's from Olivetti in December for cash. Ames also continued to direct most of its time and effort toward selling the 701, even though the market had been severely damaged by Olivetti's secret actions. Ames would not have taken these actions if it had been told the truth by Olivetti about the NBI relationship and the NBI Agreement. Furthermore, in early 1981 Ames could have become an NBI dealer for the NBI 3000, a product very similar to the 701, but Ames decided not to become an NBI dealer in part in reliance upon the false representations of Olivetti about the NBI relationship and the NBI Agreement.

21. As a result of the rumors in the trade that NBI had terminated the Agreement, it became very difficult for Ames to sell the 701 product in 1981. Ames representatives conferred on several occasions during 1981 with Olivetti representatives, but Ames was never told of the termination of the NBI Agreement. Olivetti kept this information from Ames and its other dealers, and misrepresented the fact that the Agreement had been terminated in order to be able to sell its inventory of 701's to them.

22. Mr. Kohart and Mr. Gallagher were representatives of Olivetti with whom Ames dealt, and they misrepresented the facts; and Olivetti's president had intentionally made this

possible by causing the status of the agreement to be kept secret.

23. Although Ames eventually sold the five 701's it purchased from Olivetti in December, 1980, these sales were very slow and difficult because of Olivetti's secret actions, even with reduced prices and high trade-ins, and Ames lost sales and profits as a result of Olivetti's actions.

24. In early 1981, Olivetti refused to sell Ames supplies, for cash, unless Ames would first sign notes for an amount which Olivetti said was owed to it by Ames. The reason for this action was to eliminate defenses of Ames and to make it easier for Olivetti to sue on the debt. Although Ames disputed the amount, it signed notes to Olivetti in March, 1981, for such amount. The notes were signed by Ames under protest, in order to secure a supply of parts and supplies needed by Ames to service its customers as it had promised to do. Olivetti never told Ames, during the negotiations over the notes, that it had breached its agreement with NBI, or that it could not fulfill its promises to support the 701, or that the NBI Agreement had been terminated; and Ames was not aware of these facts when it signed the notes.

Ames did owe Olivetti at the time $71,000 for equipment purchases, the amount of the series of ten notes dated March 26, 1984; and a present balance of $56,000 is owed on said notes after payments of $15,000 by Ames. Ames is entitled to an additional $15,000 reduction of the $56,000 amount as a result of an agreement with Olivetti to give Ames a dollar for dollar additional credit on payments made. The total amount owed by Ames to Olivetti on said notes is therefore $41,000. The interest note in the amount of $11,537.50 was not owed when signed. The additional $19,000, which Olivetti claims is owed to it by Ames on open account, has not been proved, is denied by Ames, and is not owed.

25. In the summer of 1981 Olivetti offered to sell Ames 10 of the 701's on credit, at a substantially discounted price. . . . Ames asked Olivetti why it was selling the products at such a low price, and Olivetti falsely told Ames it was trying to reduce its inventory so it could purchase more 701's from NBI pursuant to its contract with NBI. Olivetti never told

Ames that the NBI Agreement had been breached by Olivetti or that it had been terminated by NBI. Based upon Olivetti's misrepresentations, Ames purchased, on credit, 10 of the 701's from Olivetti in the early fall of 1981, plus two Olivetti 351's, a new word processing machine. Ames would not have purchased any of these machines if it had been told the truth by Olivetti. . . . Ames signed notes or trade acceptances for the two 351's in the amount of $6348 on August 28, 1981 and for the ten 701's in the amount of $56,000 on November 11, 1981.

26. At or about the time Olivetti sold the ten 701's to Ames, it also sold approximately 100 of these products to a consortium of NBI dealers, including one dealer in North Carolina. Olivetti did not inform Ames about this sale. When Ames' salesman, Jay Ozment, learned about the sale by Olivetti of 701's to NBI dealers, including one dealer in Raleigh, he, his wife Teresa, who was Ames' Marketing Service Representative, and Ames' serviceman, David Harrison, concluded that Olivetti had destroyed the market for the 701 for Ames, and in so doing had destroyed Ames, and they proceeded to make plans to leave Ames. Mrs. Ozment left Ames in October, 1981, Mr. Ozment and Mr. Harrison left Ames in late October or early November, 1981, and went to work for the new North Carolina dealer for NBI products, a company called IPC. Mr. Ozment and Mr. Harrison opened a Charlotte office for IPC and proceeded to take a substantial amount of Ames' service business from Ames and to successfully sell Olivetti 701's and NBI 3000's in the Charlotte area.

Mr. Ozment sold nine Olivetti 701's during his first eleven months with IPC . . . plus related accessories, totalling $130,000 in sales of Olivetti equipment. In addition, he sold NBI products similar to the Olivetti products. In his last complete fiscal year with IPC, October, 1982 through September, 1983, Mr. Ozment, using sales practices similar to those he used with Ames, sold $413,000 of NBI products. From the end of September, 1983 until the date of his testimony (May 15, 1984), he had sold $282,000 of NBI products. The gross profit on these products is approximately 35 percent.

27. If Ames had become an NBI dealer in late 1980 or early 1981, it is reasonable that Jay Ozment would not have left Ames and also David Harrison, and that Ames would have had the sales which Jay Ozment produced for IPC, and also the service business which Ames lost to IPC. Also, it is reasonable that Ames would have gotten the normal amount of service business from the additional sales.

28. Mr. Perry projects that Ames' profits, as an NBI dealer, would have been $77,000 in 1982, $121,000 in 1983, and $203,000 in 1984 and in subsequent years, based upon Mr. Ozment's sales with IPC and Mr. Perry's experience with operating costs and with related service sales and costs. The Court finds that these projections are reasonable, particularly in view of the fact that Olivetti's wrongful conduct caused Ames to take actions which make more definite projections difficult to ascertain.

.   .   .

30. Olivetti's conduct in falsely telling Ames, when Olivetti announced the 701 product, in 1979, that it had a five-year agreement with NBI for the supply of the 701, when Olivetti knew the terms of the Agreement and knew that a long-term agreement was important to the successful marketing of the 701, constitutes intentional and willful fraud and unfair and deceptive acts and practices by Olivetti against Ames. The Court finds that the false statements were made by Olivetti with the intent to deceive Ames and to induce Ames to take on and promote the 701 product, and they did in fact deceive Ames. Ames reasonably relied upon the false statements and expended considerable time and effort promoting the 701 product as a result of the false statements, to the detriment of Ames.

31. Olivetti's conduct in November, 1980, whereby it intentionally misled Ames by falsely telling Ames that its relationship with NBI was all right, and that it was negotiating with NBI for a continuation of the NBI Agreement, and that the Agreement provided for certain support for five years, when, in fact, Olivetti had breached its agreement with NBI and the two companies had agreed not to renew the NBI Agreement, and the Agreement did not provide for the sup-

port represented by Olivetti, constituted willful and intentional fraud and unfair and deceptive business acts and practices by Olivetti against Ames. Olivetti's representations were made to Ames in order to conceal Olivetti's earlier misrepresentations to Ames and to further deceive Ames and to induce Ames to continue its efforts to market the 701 product; and they did in fact deceive Ames. Ames reasonably relied upon these intentional misrepresentations, to its detriment, in that it continued to expend efforts to market the 701, and borrowed $46,000 to purchase for cash five additional 701's which it continued to market, and thereby passed up other business opportunities, including an opportunity to become an NBI dealer in early 1981.

The Court finds that Ames' damages from this continued fraud and unfair and deceptive business acts or practices, are $401,000.00. This figure includes $77,000 in lost profits in 1982, $121,000 in lost profits in 1983, and $203,000 in lost profits in 1984.

32. Olivetti's conduct in falsely telling Ames, in the fall of 1981, in connection with the sale by Olivetti to Ames of 10 additional 701's and two 351's, that it was selling the 701's at a low price in order to lower its inventory so it could purchase additional 701's from NBI pursuant to the NBI Agreement, when in fact the NBI Agreement had been terminated and Olivetti had no intention to purchase additional 701's from NBI, was further willful and intentional fraud by Olivetti against Ames, especially when viewed in connection with the earlier Olivetti representations to Ames. It also constitutes unfair and deceptive business acts or practices by Olivetti against Ames.

Olivetti's misrepresentations were made to deceive Ames and to cause Ames to purchase additional machines from Olivetti; and they did in fact deceive Ames and cause Ames to purchase ten additional 701's and two 351's from Ames, at a total cost of $62,348, which Ames would not have purchased had it known the truth. This $62,348 is part of the amount Olivetti has sued Ames for in this action. Ames has been unable, as a result of Olivetti's actions, to sell the two 351's and 7 of the 701's, and Ames sold two of the 701's at a

loss of $5200. The Court finds and concludes that Ames should return the two 351's and seven 701's to Olivetti, and that Ames then owes Olivetti $16,800 as a result of the purchase; and that Olivetti owes Ames $5200 in damages resulting from the purchase.

33. The Court finds that the total amount of actual damages suffered by Ames as a result of Olivetti's pattern of willful and intentional fraud and unfair and deceptive business acts and practices is at least as follows:

$401,000.00 resulting from the matters referred to in paragraph 31.

$5,200.00 resulting from the matters referred to in paragraph 32.

34. The Court further finds and concludes that Ames is entitled to a judgment, pursuant to G.S. 75-16, in the amount of treble its actual damages, $1,218,600.00, as a result of the unfair and deceptive acts and practices of Olivetti against Ames.

35. The Court further finds and concludes that Ames owes Olivetti the following:

$41,000 on the March 26, 1981 notes;

$16,800 on the September 1981 purchases;

$57,800 total, plus return of two 351's and seven 701's to Olivetti. In addition, Ames owes Olivetti interest on each amount, at the lawful rate, from September 1, 1981 on the $41,000 amount and from January 1, 1982 on the $16,800 amount.

The trial court made conclusions of law which are basically repetitive of its findings of fact numbers 30 through 35 and ordered as follows: that Ames recover of Olivetti $1,218,600 plus interest from the date of the judgment, that Olivetti recover of Ames $57,800 plus interest as previously described, that Ames return to Olivetti the two 351's and the seven 701's referred to previously or pay the purchase price of such equipment and that Olivetti pay the costs of the action. Both parties filed post-trial motions which were denied by the court by order entered 10 June 1985. Thereafter, both parties gave notice of appeal.

Olivetti Corp. v. Ames Business Systems, Inc.

*Weinstein, Sturges, Odom, Groves, Bigger, Jonas & Campbell, P.A., by Hugh B. Campbell, Jr., for plaintiff.*

*Joe C. Young for defendant.*

WELLS, Judge.

### Olivetti's Appeal

[1] Olivetti first argues that the trial court erred in finding that it made material misrepresentations and that Ames' reliance on such misrepresentations was reasonable. It is well established that in a non-jury trial the trial court's findings of fact are conclusive if supported by competent evidence even though there is evidence to the contrary. *Goldman v. Parkland*, 277 N.C. 223, 176 S.E. 2d 784 (1970). The trial court found that the following conduct constituted fraud: (1) Olivetti's conduct in August 1979 in falsely telling Ames, when Olivetti announced the TES-701, that it had a five-year agreement with NBI for supply of the 701; (2) Olivetti's conduct in November 1980 when it intentionally misled Ames by falsely telling Ames that its relationship with NBI was all right, that it was negotiating with NBI for a continuation of the NBI agreement and that the NBI agreement provided for certain support for five years; and (3) Olivetti's conduct in the fall of 1981 in falsely telling Ames in connection with the sale by Olivetti to Ames of TES-701's and 351's that it was selling the 701's at a discounted price in order to lower its inventory so that it could purchase additional 701's from NBI pursuant to the NBI agreement.

The trial record shows that competent evidence was presented which supports the court's findings that the representations just described were made and that such representations were false. The findings of fact made by the court, which are extensive and supported by competent evidence in the record, clearly demonstrate the materiality of the misrepresentations made by Olivetti. Moreover, the magnitude of the damage suffered by Ames as a result of its reliance on Olivetti's misrepresentations further shows the materiality of those misrepresentations.

The court found that Ames reasonably relied on the false statements made by Olivetti in August 1979, November 1980 and the fall of 1981 regarding the status and terms of the NBI agree-

ment and that Ames passed up an opportunity to become an NBI dealer in early 1981 in reliance upon Olivetti's misrepresentations. Competent evidence was presented which supports these findings. Olivetti argues, however, that Ames passed up the opportunity, if any, to become an NBI dealer in reliance upon the letter written by Kohart to Epley and that such reliance was unreasonable as a matter of law. We disagree. The evidence shows that Ames decided not to become an NBI dealer in early 1981 in reliance upon the prior misrepresentations made by Olivetti and that such reliance was reasonable. Since the findings in question are supported by competent evidence, they are binding upon us. *See Goldman, supra.*

[2] Olivetti next argues that the court erred in its findings as to the amount of damages suffered by Ames. Of the damages awarded to Ames, Olivetti contests only that part awarded for lost profits. In determining that Ames was entitled to damages for lost profits in the amount of $401,000, the court reasoned as follows: Had it not been for Olivetti's misrepresentations, Ames would have become an NBI dealer in late 1980 or early 1981. If Ames had become an NBI dealer at that time, it is reasonable to assume that Ames' salesman, Jay Ozment, and Ames' serviceman, David Harrison, would have remained with Ames. Thus, Ames would have had the sales which Ozment produced for IPC, the NBI dealer for which Ozment went to work after leaving Ames; the service business which Ames lost to IPC; and the normal amount of service business from the additional sales. Ames' profits as an NBI dealer, based on the projections of Ames' president and owner, Wade Perry, would have been $77,000 in 1982, $121,000 in 1983 and $203,000 in 1984, for a total of $401,000 for the three-year period.

Olivetti argues that Ames is not entitled to damages for lost profits because it did not have a history of profits, that the court's finding that Ames could have become an NBI dealer has no support in the record, that the court did not use a proper measure to determine Ames' lost profits and that insufficient evidence was presented to support the award.

Olivetti's argument that Ames is precluded from recovering damages for lost profits because it did not have a history of profits is based on what is sometimes called the "new business rule."

*See* Comment, *Remedies—Lost Profits as Contract Damages for an Unestablished Business: The New Business Rule Becomes Outdated,* 56 N.C. L. Rev. 693 (1978). Under this rule, recovery for lost profits is not allowed for injury to a new or unestablished business without a history of profits because evidence of expected profits from such a business is necessarily too speculative. *Id. See also* 22 Am. Jur. 2d, *Damages* § 173 (1965); Dobbs, *Handbook on the Law of Remedies* § 3.3 (1973). In contrast, lost profits may be recovered for injury to an "old" or established business because its profit record provides a sufficient minimum basis for calculation of the damages with the degree of certainty required. *See* Dobbs, *supra;* 22 Am. Jur. 2d, *Damages* § 173. It has been said that the name "new business rule" is somewhat misleading because the rule applies to any business without a history of profits in the period immediately preceding the period for which lost profits are sought to be recovered. Comment, *supra.* Thus, this rule could possibly be applied in the present case since Ames did not have a history of profits.

The "new business rule" has been criticized and there is an increasing trend in other jurisdictions either to create exceptions and mitigating sub-doctrines to the rule or simply to recognize that its rationale is not persuasive. *See* Comment, *supra;* Dobbs, *supra.* As noted by one authority:

> Courts are now taking the position that the distinction between established businesses and new ones is a distinction that goes to the weight of the evidence and not a rule that automatically precludes recovery of profits by a new business. What is required is reasonable evidence, and that may at times be found in some fact other than the fact of past profit rates.

Dobbs, *supra.* Those jurisdictions which do not follow the "new business rule" hold that it is enough to merit recovery if the existence and amount of lost profits is shown with reasonable certainty. Comment, *supra. See also* 22 Am. Jur. 2d, *Damages* § 173.

It appears from our research that North Carolina has never adopted the "new business rule." On the contrary, North Carolina apparently follows the view that recovery for lost profits is allowed for injury to a business, regardless of whether the business has a history of profits, as long as the loss of profits is shown

with a reasonable degree of certainty. *See Rannbury-Kobee Corp. v. Machine Co.*, 49 N.C. App. 413, 271 S.E. 2d 554 (1980); Hightower, *North Carolina: Law of Damages* § 2-8 (1981). We agree that this view is by far the better and more equitable one. Accordingly, we reject Olivetti's argument that Ames is precluded from recovering damages for lost profits simply because it did not have a past record of profits.

In order to recover damages for lost profits, Ames had the burden of proving with a reasonable degree of certainty that it would have realized profits had it not been for Olivetti's wrongful conduct and the amount of those profits, and that its loss was the direct and necessary result of the wrongful conduct. *See* Hightower, *supra*; 22 Am. Jur. 2d, *Damages* §§ 171, 177. As with any damages, damages for lost profits may only be recovered if sufficient evidence is presented that the trier of fact can find with reasonable certainty the fact and amount of the damages. *See* Hightower, *supra* at § 7-1; 22 Am. Jur. 2d, *Damages* § 172. Recovery for lost profits may not be based on speculation or guesswork but it will be enough if the evidence justifies an inference that the damages awarded are just and reasonable compensation for the injury suffered. *See* Hightower, *supra* at § 7-1. As one authority noted in discussing damages generally, courts seem to have striven for a balance that permits a claimant to recover even if his proof is incomplete as long as he has proven as much as he reasonably can and has proven something relevant to computation of damages. Dobbs, *supra.* It must be borne in mind that lost profits are to some extent uncertain and problematical. 22 Am. Jur. 2d, *Damages* § 172. Absolute certainty is not required but the evidence must be sufficiently specific to permit the fact finder to arrive at a reasoned conclusion. Hightower, *supra. See also Weyerhaeuser Co. v. Supply Co.*, 292 N.C. 557, 234 S.E. 2d 605 (1977). Courts state that less certainty is required to prove the amount of the lost profits than is required to show the fact that the profits were lost. 22 Am. Jur. 2d, *Damages* § 172. *See also Story Parchment Co. v. Paterson P. Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

The degree to which the evidence will succeed in establishing the reasonable certainty of lost profits depends in large part on the circumstances of the particular case. Note, *The Requirement Of Certainty In The Proof Of Lost Profits*, 64 Harv. L. Rev. 317

(1950). Consistent with this, it appears that the degree of accepta-
ble uncertainty varies with the strength of the underlying sub-
stantive legal policy. Dobbs, *supra*; Comment, *supra*. *See also*
Note, *supra*. "The more reprehensible a defendant's behavior, the
more the law will feel justified in resolving doubts against him
concerning the consequences of the behavior." Comment, *supra*.
Thus, courts have applied a more liberal rule in cases involving
wrongful conduct such as tort and antitrust cases. *See, e.g., Stef-
fan v. Meiselman*, 223 N.C. 154, 25 S.E. 2d 626 (1943) (Whatever
may be the rule in contract actions, a more liberal rule should
prevail in tort actions); *Bigelow v. RKO Radio Pictures*, 327 U.S.
251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Story Parchment Co., supra.*
*See generally* Comment, *supra*. As the United States Supreme
Court stated in *Story Parchment Co., supra*:

> Where the tort itself [or the wrongful conduct] is of such
> a nature as to preclude the ascertainment of the amount of
> damages with certainty, it would be a perversion of funda-
> mental principles of justice to deny all relief to the injured
> person, and thereby relieve the wrongdoer from making any
> amend for his acts. In such case, while the damages may not
> be determined by mere speculation or guess, it will be
> enough if the evidence show the extent of the damages as a
> matter of just and reasonable inference, although the result
> be only approximate. The wrongdoer is not entitled to com-
> plain that they cannot be measured with the exactness and
> precision that would be possible if the case, which he alone is
> responsible for making, were otherwise.

In such situations, justice and sound public policy require that the
wrongdoer bear the risk of the uncertainty which his own wrong
has created. *Id. See also Bigelow, supra.*

[3] We now apply these principles to the present case and con-
sider the remaining arguments made by Olivetti regarding the
damages awarded to Ames for lost profits. We first conclude that
there is sufficient evidence in the record to support the finding
that Ames could have become an NBI dealer. Although the evi-
dence does not conclusively show that Ames could have become
an NBI dealer in early 1981, sufficient evidence was presented to
permit the court to find with reasonable certainty that Ames

could and would have become an NBI dealer in early 1981 had it not been for the false representations made by Olivetti.

The evidence tends to show that in early 1981, NBI was interested in establishing a dealership in the Charlotte area; that in March 1981, Audley Downs, NBI's eastern regional manager for dealer operations, met with Wade Perry and Ames' other personnel to discuss the possibility of Ames becoming an NBI dealer; that one of Mr. Downs' primary duties was to recruit new dealers for NBI; that Mr. Downs was very much impressed with the personnel at Ames and thought that Ames could be successful in selling, supporting and servicing the NBI product line and that Ames could have been a good NBI dealer; and that it would cost Ames between $26,000 and $45,000 to become an NBI dealer. Although Mr. Downs testified that to the best of his knowledge he did not make a formal offer to Ames to become an NBI dealer, the testimony of Wade Perry, Jay Ozment and David Harrison shows that Ames was told that it could become an NBI dealer if it purchased $25,000-$30,000 worth of NBI equipment. The evidence tends to show that Ames decided not to become an NBI dealer based on the promises and assurances it had received from Olivetti and based on the purchase it had recently made of additional Olivetti equipment in reliance on Olivetti's misrepresentations and that if Olivetti had told Ames the truth about its relationship and agreement with NBI, Ames would not have passed up the opportunity to become an NBI dealer. In addition, sufficient evidence was presented to permit the court to find that Ames either had the financial capability in early 1981 to become an NBI dealer or that it would have had such financial capability had it not been for Olivetti's misrepresentations. We conclude that there is adequate support in the record for the finding in question.

[4]   We next consider Olivetti's argument that the trial court did not use a proper measure to determine Ames' lost profits. Olivetti contends the court used IPC's sales to measure Ames' lost profits and that such measure was error as a matter of law because a more definite measure — Ames' history of profits or losses — was available and because IPC is too different from Ames to be used as a meaningful yardstick. The court, however, did not determine Ames' lost profits by using the sales record of IPC, as a comparable business, as suggested by Olivetti. The court's determination of the fact and amount of Ames' lost profits is based on the

sales and service business which Ames lost to IPC because it passed up the opportunity to become an NBI dealer in reliance on Olivetti's misrepresentations. The sales and service business which the court considered is that which was produced for IPC, an NBI dealer, by Ames' former salesman, Ozment, and Ames' former serviceman, Harrison, both of whom the court found would have remained with Ames had it not been for Olivetti's wrongful conduct. The court's finding that Ozment and Harrison would have remained with Ames if Ames had become an NBI dealer in late 1980 or early 1981 is clearly supported by the evidence.

In determining Ames' lost profits, the court basically accepted the projections of Ames' president and owner, Wade Perry. Perry's projections were based on Ozment's actual sales during the period between October 1981 and March 1984, the projected gross profit margin on those sales which figure was based on the gross profit margin realized by Ames in prior years, the projected service revenue generated by Ozment's sales which projection was based on Perry's knowledge of and experience in the industry and on Ames' past record, and Ames' projected operating expenses which projection was based on Ames' operating expenses in prior years. We note that the court correctly based its award on Ames' projected net, rather than gross, profits. *See* 22 Am. Jur. 2d, *Damages* § 178. The court found that Perry's projections were reasonable, particularly in view of the fact that Olivetti's wrongful conduct made more definite projections difficult to ascertain, and we agree. Perry's projections are reasonable and conservative and are adequately supported by evidence in the record.

Various means are available to claimants in attempting to prove lost profits with the requisite degree of certainty. Note, *supra. See Rannbury-Kobee Corp. v. Machine Co., supra.* There is no single method of determining lost profits which can be applied in all cases. 22 Am. Jur. 2d, *Damages* § 178. Each case must be determined according to its own facts, keeping in mind the goal of the damage remedy for those facts. *Id.* We are unable to say that the method used by the court here to ascertain Ames' lost profits was improper given the circumstances of this case. Ozment testified that there was no substantial difference between the sales techniques he used while working for IPC and those he used while with Ames. Given this, use of the sales made by Ozment for

IPC, an NBI dealer, during the relevant time period and in the same or similar geographical area in which Ames operated and the service business generated from those sales to determine the profits which Ames would have made during the same time period as an NBI dealer seems particularly reliable.

Olivetti argues, however, that even if the measure used by the court to determine Ames' lost profits was proper, the only basis in the record for the court's findings as to those profits is the unsubstantiated opinion testimony of Wade Perry and that such testimony alone is inadequate to support the award. We disagree. The court's findings as to the profits lost by Ames are supported not only by Perry's testimony but also by Ozment's testimony and certain documentary evidence submitted to the court, such as Ames' tax returns. Perry's projections, in turn, are not mere guesswork, but are based on evidence in the record and therefore provide a sufficient basis for the findings and award made. *See Tillis v. Cotton Mills*, 251 N.C. 359, 111 S.E. 2d 606 (1959).

We conclude that sufficient evidence was presented to permit the court to find with a reasonable degree of certainty that Ames lost profits for the years 1982 through 1984 in the amount of $401,000 and that such loss was the direct and necessary result of Olivetti's wrongful conduct. The evidence supports the findings and award made with respect to such profits and justifies the conclusion that the damages awarded are fair and reasonable compensation for the injury suffered. Accordingly, we find no error in the damages awarded to Ames for its loss of profits for the years 1982 through 1984.

[5] Olivetti next contends the court erred in applying N.C. Gen. Stat. § 75-1.1 (1985) to the distributor-dealer relationship between Olivetti and Ames. Olivetti argues that G.S. § 75-1.1 applies only to transactions involving consumers, that Ames is a dealer rather than a consumer or "user" of Olivetti equipment and that therefore Ames has no standing to sue Olivetti under N.C. Gen. Stat. § 75-16 (1985). G.S. § 75-1.1 provides in relevant part as follows:

(a) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.

(b) For purposes of this section, "commerce" includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession.

G.S. § 75-16 provides:

If any person shall be injured or *the business* of any person, firm or *corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other* person, firm or *corporation* in violation of the provisions of this Chapter, such person, firm or *corporation* so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict. [Emphasis added.]

G.S. § 75-1.1(b) has been broadly applied to cover many activities. *Kim v. Professional Business Brokers*, 74 N.C. App. 48, 328 S.E. 2d 296 (1985). This section is not broad enough, however, to encompass "all forms of business activities," but was adopted to ensure that the original intent of G.S. § 75-1.1 as set forth in G.S. § 75-1.1(b) (1977) was effectuated. *Threatt v. Hiers*, 76 N.C. App. 521, 333 S.E. 2d 772 (1985), *disc. rev. denied*, 315 N.C. 397, 333 S.E. 2d 772 (1986). G.S. § 75-1.1 as originally enacted contained the following declaration of legislative intent in Section (b):

The purpose of this section is to declare, and to provide civil legal means to maintain, ethical standards of dealings *between persons engaged in business*, and between persons engaged in business and the consuming public within this State, to the end that good faith and fair dealings *between buyers and sellers at all levels of commerce* be had in this State. [Emphasis added.]

N.C. Gen. Stat. § 75-1.1 (1975). Any party claiming to be exempt from the provisions of the statute has the burden of proof with respect to such claim. G.S. § 75-1.1(d) (1985); *Edmisten, Attorney General v. Penney Co.*, 292 N.C. 311, 233 S.E. 2d 895 (1977).

We think it is clear that the activities concerned herein fall within the intended scope of G.S. § 75-1.1. The actions in question undoubtedly were in commerce and Olivetti has failed to show that it is otherwise exempt from the operation of the statute's

provisions. It is also clear that individual consumers are not the only ones protected and provided a remedy under G.S. §§ 75-1.1 and 75-16. This is obvious both from the language of the statutes and from the decisions of the appellate courts of this State. *See, e.g., Winston Realty Co. v. G.H.G., Inc.*, 314 N.C. 90, 331 S.E. 2d 677 (1985); *Johnson v. Insurance Co.*, 300 N.C. 247, 266 S.E. 2d 610 (1980); *F. Ray Moore Oil Co., Inc. v. State of N.C.*, 80 N.C. App. 139, 341 S.E. 2d 371 (1986); *Concrete Service Corp. v. Investors Group, Inc.*, 79 N.C. App. 678, 340 S.E. 2d 755 (1986). The case on which Olivetti primarily relies for this argument, *Bunting v. Perdue, Inc.*, 611 F. Supp. 682 (E.D.N.C. 1985), is distinguishable and unpersuasive on this issue and certainly is not controlling on this Court. We conclude that G.S. § 75-1.1 is applicable in the present case and that Ames has standing under G.S. § 75-16 to bring this action.

[6] Olivetti argues that even if G.S. § 75-1.1 is applicable in this case, there is no basis in the record for the court's findings that Olivetti committed unfair and deceptive acts and practices. This argument is premised on Olivetti's previous argument that the court erred in ·finding that Olivetti made material misrepresentations. We rejected that argument and reject the present argument as well. The court found that Olivetti's conduct as particularly described in findings numbers 30, 31 and 32 constituted fraud. There is competent evidence in the record which supports these findings. "Proof of fraud necessarily constitutes a violation of the prohibition against unfair and deceptive acts." *Winston Realty Co., supra, citing Hardy v. Toler*, 288 N.C. 303, 218 S.E. 2d 342 (1975).

[7] Olivetti further contends that G.S. § 75-1.1, as applied in this case, is unconstitutionally vague and overbroad. The constitutional doctrine that statutes may be held void for vagueness is designed to require that statutes adequately warn people of conduct required or prohibited. *Ellis v. Ellis*, 68 N.C. App. 634, 315 S.E. 2d 526 (1984). *See also United States v. Mazurie*, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed. 2d 706 (1975). As our Supreme Court stated in *In re Burrus*, 275 N.C. 517, 169 S.E. 2d 879 (1969), *aff'd*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed. 2d 647 (1971):

"A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must

necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." . . . Even so, impossible standards of statutory clarity are not required by the constitution. When the language of a statute provides an adequate warning as to the conduct it condemns and prescribes boundaries sufficiently distinct for judges or juries to interpret and administer it uniformly, constitutional requirements are fully met. [Citations omitted.]

Courts should scrutinize the constitutionality of a statute only as applied in the case at hand. 16 Am. Jur. 2d, *Constitutional Law* § 173 (1979). *See also In re Biggers*, 50 N.C. App. 332, 274 S.E. 2d 236 (1981); *State v. Covington*, 34 N.C. App. 457, 238 S.E. 2d 794 (1977), *disc. rev. denied*, 294 N.C. 184, 241 S.E. 2d 519 (1978). Clearly, the language of G.S. § 75-1.1 provides adequate notice that conduct constituting fraud is prohibited. *See Hardy v. Toler, supra.* Therefore, we do not agree that the statute is unconstitutional as applied in this case.

[8] Olivetti assigns as error the trial court's refusal to award to it the full amount allegedly owed to it by Ames on accounts receivable for goods sold. Of the $148,990.68 which Olivetti sought to recover, the court awarded Olivetti $57,800.00 plus interest. The court further directed Ames to return to Olivetti the two 351's and the seven 701's which Ames purchased from Olivetti in the fall of 1981 or pay the purchase price for each piece of equipment not returned. Olivetti argues that the court erred in not awarding to it the amount owed by Ames for the two 351's and the seven 701's.

The court concluded that since Ames purchased the 351's and the 701's as a result of Olivetti's fraud and unfair and deceptive acts and practices and had not yet sold the machines or paid Olivetti for them, as a matter of equity the sale of the machines should be rescinded and Ames should return the machines to Olivetti and owe nothing for them or pay the purchase price for each machine not returned. We find no error in this and therefore overrule this assignment of error.

[9] Lastly, Olivetti argues that the court erred in not deducting the amount of its recovery from the damages awarded to Ames prior to trebling Ames' damages. We disagree. Offsetting Ames' damages by the amount of Olivetti's recovery prior to trebling

the damages would amount to a triple recovery for Olivetti and would frustrate the punitive function of the treble damage provision. *See Marshall v. Miller*, 302 N.C. 539, 276 S.E. 2d 397 (1981) (G.S. § 75-16 is partly punitive in nature). Certainly this is not what our legislature intended.

## Ames' Appeal

[10]　Ames contends the trial court erred in not awarding it damages for the expenses it wasted during the period from August 1979 through December 1981 due to Olivetti's misrepresentations and for its loss of profits after 1984 resulting from Olivetti's wrongful conduct. Ames was awarded damages for its loss of profits in 1982, 1983 and 1984 and for the loss it sustained on the sale of two 701's but was not otherwise awarded any damages for the period from August 1979 through December 1981 or for any time period after 1984. We conclude that Ames failed to prove with the requisite degree of certainty that it was entitled to recover any damages other than those which it was awarded.

At trial, Ames sought to recover in full the amount of its expenses for the period from August 1979 through December 1981. It now in essence concedes that it is not entitled to the full amount it requested at trial and asks that this Court calculate its damages according to a new formula proposed by it which it maintains is a more reasonable and conservative measure of its actual damages for the period. Under this formula, Ames asks that the court determine its damages by calculating the amount of its expenses devoted to the 701 during the period in question and subtract from that amount the profit made and the service revenue obtained by it as a result of its sales of 701's during the period.

Even if we were so inclined to calculate Ames' damages for Ames and accepted the formula just stated as a proper measure of the damages in question, insufficient evidence was presented at trial to permit the calculation of the damages under this formula with the requisite degree of certainty. Ames had the burden of presenting sufficient evidence to permit the trier of fact to find with reasonable certainty the fact and amount of these damages. *See* Hightower, *supra* at § 7-1. This it failed to do. Specifically, Ames failed to present sufficient evidence to permit the court to find with reasonable certainty the portion or amount of its ex-

penses or losses during this period which was attributable to Olivetti's wrongful conduct rather than to other factors. In addition, we note that, had Ames been awarded the damages it now seeks for its expenses incurred from August 1979 until December 1981 as well as damages for lost profits in the years 1982 through 1984, it would have received to a certain extent a double recovery.

The evidence presented in support of Ames' claim for loss of profits after 1984 was simply too speculative to permit recovery. As Ames concedes, the certainty of its profits after 1984 is less than the certainty of its profits prior to that time when Ozment's actual sales are known. The evidence presented was not sufficient to permit the court to determine with any degree of certainty the fact or amount of Ames' lost profits after 1984; thus, Ames' claim for such damages was properly denied.

[11]   Ames next argues that the trial court erred in refusing to assess punitive damages against Olivetti in an amount greater than and in lieu of the treble damages awarded Ames. Both the awarding of punitive damages and the amount to be allowed, if any, rest in the sound discretion of the trier of fact. *Worthy v. Knight*, 210 N.C. 498, 187 S.E. 771 (1936). Given the substantial amount of the treble damages, we find no abuse of the court's discretion in refusing to award punitive damages in an even greater amount. It is clear that the court believed that the amount awarded was sufficient to compensate Ames for the injury suffered by it and to penalize Olivetti for its wrongful conduct. We are inclined to agree.

[12]   Lastly, Ames argues that the court abused its discretion in refusing to award reasonable attorney's fees to Ames pursuant to N.C. Gen. Stat. § 75-16.1 (1985). G.S. § 75-16.1 authorizes the presiding judge to allow a reasonable attorney fee to the duly licensed attorney representing the prevailing party upon the finding of certain facts. Award or denial of such fees, even where supporting facts exist, is within the discretion of the trial judge. *Concrete Service Corp. v. Investors Group, Inc., supra.* We perceive no abuse of that discretion here.

The judgment entered by the trial court is hereby affirmed.

In re Foreclosure of Cooper

Affirmed.

Chief Judge HEDRICK and Judge MARTIN concur.