IN THE MATTER OF: THE APPEAL OF LAND AND MINERAL COMPANY FROM THE VALUATION OF CERTAIN OF ITS PROPERTY, TO WIT: 9,000 ACRES OF MINERAL RIGHTS BY THE AVERY COUNTY BOARD OF EQUALIZATION AND REVIEW FOR 1978

No. 8024SC427

(Filed 2 December 1980)

**Taxation § 25.4— ad valorem taxes — value of mineral rights**

> A finding by the State Board of Equalization and Review that a county's revaluation of petitioner's mineral rights from $2.00 per acre to $50.00 per acre was not in excess of the true value of the rights was not supported by competent, material and substantial evidence in view of the whole record where (1) petitioner rebutted the presumption of correctness of the tax assessment by showing that the county's valuation was arbitrary in that it was based upon values for mineral rights in two adjoining counties, and the county did not consider the advantages or disadvantages of the location, availability of water, or the nature of the mineral, quarry or other valuable deposits as required by G.S. 105-317(a)(1), and (2) petitioner showed that the $50.00 valuation was substantially greater than the "true value" of the rights where the only attempt to estimate a market value for the mineral rights on petitioner's land was testimony by petitioner's witness that $10.00 an acre would be a big price, and the county's evidence of value consisted only of previously determined values of mineral rights in two other counties and deeds showing values of mineral rights conveyed in the county ranging from $50.00 to $156.00.

APPEAL by respondents from *Ervin, Judge.* Judgment entered 29 February 1980 in Superior Court, AVERY County. Heard in the Court of Appeals 17 October 1980.

Land and Mineral Company is the owner of approximately 9,000 acres of mineral rights in Avery County, North Carolina. Prior to 1978, these mineral rights had been appraised for *ad valorem* tax purposes by Avery County at $2.00 per acre. In 1978, the Avery County Board of Equalization and Review reappraised these mineral rights and placed a value on them of $50 per acre. Land and Mineral Company appealed this valuation to the North Carolina Property Tax Commission, sitting as the State Board of Equalization and Review (hereinafter State Board).

The State Board conducted a hearing in this matter. Francis E. Fields, President of Land and Mineral Company, testified that he knew of no mineral deposits on the Land and Mineral Company lands, and that felspar and mica were minerals generally found in Avery County. On cross-examination, Mr. Fields testified that

Harris Mining Company had leased 189 acres of land from Land and Mineral Company at an annual rate of $1,000 and that Ray Wiseman was leasing the mineral and mining rights on 20 acres of land in Avery County for $600 per year from Land and Mineral Company. Arthur Buchanan, an employee of Land and Mineral Company testified:

> That he has been employed by Land and Mineral Company since the early 1950's; that the minerals commonly found on the Land and Mineral Company lands are mica, felspar, kaolin and olivene; that there are no mining operations currently being carried out on Land and Mineral Company lands; that Harris Mining Company is not actively mining now; that "eighty percent of it (Land and Mineral Company land) is in the mountains or it's hard to get to . . .";

> . . .

> That in the last ten years no one has wanted to lease any Land or Mineral company mining rights; that nothing has occurred on the Land and Mineral Company lands that has affected the value of mining rights in the last ten years.

> On re-direct examination, Mr. Buchanan testified:

> That in his opinion the value of mineral rights owned by Land and Mineral Company in Avery County would be ten dollars an acre;

> . . .

> [B]ut these things that have been exposed have been mined on that property and we know what they're selling for, the present day price, and we know what they are, and in seventeen years there hasn't been any mines leased and until something happens, I think ten dollars an acre would be a big price.

Mr. Buster Hayes, the Tax Supervisor for Avery County, was the sole witness for the county. Mr. Hayes testified that Avery County based its 1978 reappraisal solely upon valuations in adjoining counties, Yancey and Mitchell.

The State Board made findings of fact and concluded that Avery County's valuations of the mineral rights were not in excess

of their true value and sustained the $50 figure. Land and Mineral Company appealed the decision of the State Board to the Superior Court by filing a petition for review pursuant to G.S. 150A-43 *et seq.*

No additional evidence was offered by either party at the Superior Court hearing. The Superior Court considered the record of the hearing before the State Board, the arguments of counsel for the county and the petitioner, and the written briefs of both the county and petitioner. The court concluded, and entered judgment accordingly, that Avery County had not complied with the requirements of G.S. 105-283, *Uniform appraisal standards,* and G.S. 105-317, *Appraisal of real property; adoption of schedules, standards, and rules;* that the Conclusions, Decision and Order of the Board in sustaining the reappraisal of the petitioner's mineral rights were unsupported by substantial evidence admissible under G.S. 150A-29(a) or G.S. 150A-130, and that the Board's decision be reversed and the matter remanded to the Board with directions that the Board remand the matter to Avery County with directions that the Avery County Board of Commissioners cause the mineral rights of Land and Mineral Company to be appraised in accordance with law.

Respondent, Avery County, appealed from this judgment.

*Adams, Hendon, Carson and Crow, by Philip G. Carson, for petitioner appellee.*

*William B. Cocke, Jr., for respondent appellant.*

MORRIS, Chief Judge.

In this case we are asked to determine whether the Superior Court correctly determined that the evidence presented to the State Board did not support its conclusions.

Here, we must review the actions of a State administrative agency, and of the Superior Court which determined that the agency's conclusions were in error. When reviewing an order of a State agency such as the State Board, the Superior Court may not make findings contrary to the State Board's when the findings of the State Board are supported by "competent, material, and substantial evidence". *In re Appeal of Amp, Inc.,* 287 N.C. 547, 561, 215 S.E. 2d 752, 761 (1975), and cases cited therein.

G.S. 150A-51 specifies the scope of review and the power of the courts in disposing of a case appealed from the decision of a State

In re Land and Mineral Co.

agency. That statute provides in part:

> The court may affirm the decision of the agency or re-
> mand the case for further proceedings; or it may reverse
> or modify the decision if the substantial rights of the
> petitioners may have been prejudiced because the agency
> findings, inferences, conclusions, or decisions are:
>
> . . .
>
> (5) Unsupported by substantial evidence admissible
> under G.S. 150A-29(a) or G.S. 150A-30 in view of the
> entire record as submitted; or
>
> (6) Arbitrary or capricious.

Upon considering the judicial rule of *Amp* in conjunction with
G.S. 150A-51 the standard of review derived therefrom, which we
must apply in this case, is whether the decision of the State Board
was supported by "competent, material, and substantial evidence."

The scope of judicial review of agency decisions required by
G.S. 150A-51 has been construed by the Supreme Court in *Thomp-
son v. Board of Education*, 292 N.C. 406, 233 S.E. 2d 538 (1977).
There the Court stated:

> This standard of judicial review is known as the "whole
> record" test and must be distinguished from both *de novo*
> review and the "any competent evidence" standard of
> review. *Universal Camera Corp. v. N.L.R.B.*, 340 U.S.
> 474, 95 L.Ed. 456, 71 S.Ct. 456 (1951); *Underwood v.
> Board of Alcoholic Control*, 278 N.C. 623, 181 S.E. 2d 1
> (1971); Hanft, *Some Aspects of Evidence in Adjudication
> by Administrative Agencies in North Carolina*, 49 N.C.L.
> Rev. 635, 668-74 (1971; Hanft, *Administrative Law*, 45
> N.C.L. Rev. 816, 816-19 (1967). The "whole record" test
> does not allow the reviewing court to replace the Board's
> judgment as between two reasonably conflicting views,
> even though the court could justifiably have reached a
> different result had the matter been before it *de novo*.
> *Universal Camera Corp., supra*. On the other hand, the
> "whole record" rule requires the court, in determining
> the substantiality of evidence supporting the Board's
> decision, to take into account whatever in the record

fairly detracts from the weight of the Board's evidence. Under the whole evidence rule, the court may not consider the evidence which in and of itself justifies the Board's result, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn. *Universal Camera Corp., supra.* 292 N.C. at 410, 233 S.E. 2d at 541.

In the present case it does not appear from a view of the "whole record" that the decision of the State Board was supported by "competent, material, and substantial evidence". In this instance the State Board, rather than Superior Court, is the fact finding body. Therefore, we examine the record to determine whether the evidence presented to the State Board was sufficient to support its conclusions.

It is a principle of law in this State that *ad valorem* tax assessments are presumed to be correct. *See, In re Appeal of Amp, Inc.,* 287 N.C. 547, 215 S.E. 2d 752 (1975); *Electric Membership Corp. v. Alexander,* 282 N.C. 402, 192 S.E. 2d 811 (1972); 72 Am. Jur. 2d *State and Local Taxation* § 713 (1974). This presumption places the burden of proof that they are incorrect with the taxpayer, here the petitioner.

Justice Copeland's opinion in *In re Appeal of Amp, Inc., supra,* sets out the two-pronged test the court must apply when making its determination with respect to whether the taxpayer has overcome that presumption. He states that:

> [I]n order for the taxpayer to rebut the presumption he must produce "competent, material and substantial" evidence that tends to show that: (1) Either the county tax supervisor used an *arbitrary method* of valuation; or (2) the county tax supervisor used an *illegal method* of valuation; AND (3) the assessment *substantially* exceeded the true value in money of the property. *See Albemarle Electric Membership Corp. v. Alexander, supra,* 282 N.C. 410, 192 S.E. 2d at 816-17. Simply stated, it is not enough for the taxpayer to show that the means adopted by the tax supervisor were wrong, he must also show that the result arrived at is *substantially* greater than the true value in money of the property assessed, i.e., that the valuation was *unreasonably high. Id.* . . .

In re Land and Mineral Co.

*In re Appeal of Amp, Inc.,* 287 N.C. 547, 563, 215 S.E. 2d 752, 762 (1975).

In our opinion petitioner's evidence was sufficient to meet the requirements of this test and rebut the presumption of correctness.

The record clearly indicates that the Avery County tax supervisor employed an "arbitrary" method of valuation. Guidelines for the proper appraisal of real and personal property are set out in the General Statutes.

G.S. 105-317 provides in part:

*Appraisal of real property; adoption of schedules, standards, and rules.* — (a) Whenever any real property is appraised it shall be the duty of persons making appraisals:

(1) In determining the true value of land, to consider as to each tract, parcel, or lot separately listed at least its advantages and disadvantages as to location; zoning; quality of soil; waterpower; water privileges; mineral, quarry, or other valuable deposits; fertility; adaptability for agricultural, timber-producing, commercial, industrial, or other uses; past income; probable future income; and any other factors that may affect its value except growing crops of a seasonal or annual nature.

(b) In preparation for each revaluation of real property required by G.S. 105-286, it shall be the duty of the tax supervisor to see that:

(1) There be developed and compiled uniform schedules of values, standards, and rules to be used in appraising real property in the county. (The schedules of values, standards, and rules shall be prepared in sufficient detail to enable those making appraisals to adhere to them in appraising the kinds of real property commonly found in the county; they shall be:

a. Prepared prior to each revaluation required by G.S. 105-286;

b. In written or printed form; and

c. Available for public inspection upon request.)

(2) Every lot, parcel, tract, building, structure, and improvement being appraised be actually visited, observed, and appraised by a competent appraiser, either one appointed under the provisions of G.S. 105-296 or one employed under the provisons of G.S. 105-299.

The record does not support the State Board's conclusion that the evidence supports the county's reappraisal. The reappraisal method used in this instance was not in accord with the statutory requirements set forth above. It is clear from the county's evidence that it based its valuation upon previously determined values for mineral rights in two adjoining counties, Mitchell and Yancey. Buster Hayes, the Avery County Tax Supervisor, testified that the *only* criteria he used in reappraising the value of the mineral rights was the value placed on similar rights in the adjacent counties.

The land in question is a 9,000 acre tract. The $50 per acre reappraisal was a blanket valuation. It is hard to believe that all 9,000 acres of this tract deserve exactly the same valuation. There is no evidence that the county considered the advantages or disadvantages of the location; availability of water; or the nature of the mineral, quarry, or other valuable deposits consideration of which, among other facts, is required by G.S. 105-317(a)(1). Further, and perhaps most importantly, there is no evidence that any representative of Avery County ever visited or observed any portion of the tract in question as required by G.S. 105-317(b)(2).

Having shown, we think most adequately, that the county's valuation method was arbitrary, the petitioner had to meet the second part of the *Amp* test and show that the value determined was substantially greater than the "true value" of the property assessed. The facts before the State Board do not support its conclusion that the $50 figure was correct.

"True value" is defined by G.S. 105-283 as "meaning market value, that is, the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller."

There is no evidence in the record substantially supporting the State Board's implied conclusion that $50 is the "true value" of these mineral rights. The evidence presented by the county as to the "true value" of the mineral rights consisted of the previously determined values of mineral rights in Mitchell and Yancey Counties, and three deeds dated and recorded in 1977 conveying mineral rights on relatively small tracts in Avery County. The documentary stamps affixed to these last three deeds indicated that the per acre purchase price for these mineral rights ranged from $50 to $156.

In the present case, the values placed on mineral rights on other lands is not, standing alone, substantial evidence under the statutory definition of the "true value" of the mineral rights in the tract in question. There may be great variances in factors such as location, topography, accessibility, and mineral content, to name a few, which would cause the "market value" of one tract to be quite different from another.

The only evidence in the record which reflects an attempt to estimate a "market value" for this particular parcel of land is the testimony of petitioner's witness, Arthur Buchanan. The record shows that Mr. Buchanan had been employed by the petitioner "since the early 1950's", and he had some special knowledge of the value of the mineral rights in this locality. The witness testified as to the value he would place on the mineral rights: "in seventeen years there hasn't been any mines leased and until something happens, I think ten dollars an acre would be a big price".

Expert appraisal of the value of the mineral rights on the actual parcel of land in question is more substantial evidence of the "true value" of those particular rights than the reports of similar previous sales of mineral rights from various other tracts of land. The peculiar nature of mineral rights must be kept in mind when considering this evidence.

The county's own evidence illustrates the variance which can occur in the "market price" for mineral rights from separate parcels of land located in the same proximity. Even assuming that the three deeds introduced into evidence convey only mineral rights on the three separate tracts of land located within Avery County, they show values ranging from $50 to $156. This indicates that the value that "able buyers" are willing to give for the mineral rights on different parcels of land varies a great deal according to the proper-

ties of the particular piece of land.

The $50 per acre value which the county placed on the mineral rights on petitioner's 9,000 acres is five times the amount of $10 per acre which Mr. Buchanan estimated as being a "big price" for these rights. When we take the "whole record" into consideration, the value determined by the county appears to be substantially in excess of the only estimate of the "true value" of the mineral rights appearing therein. The evidence does not substantially support the State Board's implied finding that the county's $50 value is not in excess of the "true value" of the mineral rights on this land.

Our review of all the evidence in the record results in our conclusion that the findings, conclusions and decisions of the State Board are not supported by competent, material and substantial evidence. Accordingly, the judgment of the Superior Court is

Affirmed.

Judges ARNOLD and HILL concur.