891 F.2d 286
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Gordon BARNES; Glenn Phelps, individually and on behalf of
others similarly situated with themselves,
Plaintiffs-Appellants,
v.
CARGILL, INCORPORATED, Defendant-Appellee.
 No. 88-2215.
 United States Court of Appeals, Fourth Circuit.
 Argued: May 11, 1989.
Decided: Nov. 22, 1989.
 
 William Walton Pritchett, Jr. (Pritchett, Cooke & Burch, on brief), for appellants.
 William Henry Holdford (Henry C. Babb, Jr., Walter L. Hinson (Narron, Holdford, Babb, Harrison & Rhodes, P.A., on brief), for appellee.
 Before K.K. HALL and WILKINSON, Circuit Judges, and GLEN M. WILLIAMS, Senior United States District Judge for the Western District of Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 Plaintiffs Gordon Barnes and Glenn Phelps, who breed and raise swine for a living, brought suit against Cargill, Inc., a large international company also involved in the swine business, alleging breach of contract; fraud; unfair and deceptive trade practices under N.C.Gen.Stat. § 75-1.1 (1985); violation of the North Carolina Business Opportunity Sales Act, N.C.Gen.Stat. § 66-94, et seq. (1985); and conversion. They also sought certification of their suit as a class action.
 
 
 2
 The trial court denied the motion for class certification and dismissed the unfair trade practices and Business Opportunity Sales Act counts. After reviewing depositions, affidavits, and exhibits introduced by the parties, the trial court granted summary judgment on the remaining counts. The plaintiffs appeal.
 
 
 3
 The plaintiffs offered the following version of events leading up to this suit: Phelps and Barnes were approached in 1985 by an individual named Dale Warsco, whom they both had known for some years as an operator of swine farms in Eastern North Carolina. At the time he was the sole owner of a corporation known as H.O.G.S., Inc., though this company was soon absorbed into a new entity, B & D Milling Co., the stock of which was owned 50% by Mr. Warsco and 50% by a Dr. Bradsher. Warsco wanted Phelps and Barnes to help him feed and care for a large number of hogs belonging to Cargill, for which he (Warsco), through B & D Milling, had contracted to raise for Cargill. At all times Cargill owned all of the pigs and hogs; B & D Milling's job was to raise them for Cargill until they were ready for market.
 
 
 4
 Warsco explained that Cargill would pay B & D Milling, which in turn would pay Phelps and Barnes for their work in raising the swine. In fact, B & D Milling was insolvent, and although it was paid by Cargill for the period of November 27, 1985 to January 15, 1986, none of this money was ever turned over to the plaintiffs. They allege that Cargill was well aware of B & D's financial straits at the time B & D contracted with them, and that it was fraudulent to conceal this information, as well as an unfair and deceptive trade practice. Furthermore, they allege that Cargill's failure to reimburse them after Cargill's "agent" had entered into the deal with them was a breach of contract.
 
 
 5
 Cargill maintains that there is no question of a breach of contract because Warsco (or B & D) was an independent contractor rather than an agent of Cargill; that Warsco could not and did not therefore bind Cargill when he entered into his agreement with Barnes and Phelps; and therefore the complete lack of privity between the plaintiffs and Cargill is a bar to the contract claim. Warsco, they say, was acting entirely on his own in subcontracting some of the hogs to the plaintiffs, while Barnes and Phelps were sophisticated businessmen who were well acquainted with Dale Warsco and his financial condition, better acquainted, in fact, than Cargill was. The trade practices engaged in by Cargill could not have been unfair or deceptive under North Carolina law, furthermore, because breach of contract alone is not enough to support such a claim.
 
 
 6
 We will consider each issue seriatim.
 
 I. BREACH OF CONTRACT
 A. Agency
 
 7
 On appeal, one of plaintiffs' two grounds for stating that the trial court should not have granted summary judgment against Barnes on the breach of contract count[1] is certain testimony in the deposition of Roland Henry "Moe" Mohesky, a Vice-President of Cargill, to the effect that Dale Warsco was acting as an agent of Cargill when he negotiated the producer agreements with Barnes and Phelps. Before signing the deposition, Mohesky attached an errata sheet changing his answer to say that Warsco was a "contractor." Barnes insists that this "contradiction" at least creates a question of fact for a jury to resolve. However, matters are not quite that simple.
 
 
 8
 On a motion for summary judgment, the moving party is entitled to judgment as a matter of law where the non-moving party has failed to make a sufficient showing of an essential element of his case on which he has the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The standard for granting summary judgment mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a). Anderson v. Liberty Lobby, Ind., 477 U.S. 242, 250 (1986); see also Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 624 (1944). Rule 50(a) requires the trial judge to direct a verdict if, under controlling law, there can be only one reasonable conclusion as to the verdict. Brady v. Southern R. Co., 320 U.S. 476, 479-80 (1943). Cf. Wilkerson v. McCarthy, 336 U.S. 53, 62 (1949) (where reasonable minds could differ as to the interpretation of evidence, verdict should not be directed). Of course, the standard under Rule 56 is more than "the mere existence of some alleged factual dispute between the parties;" there must be "no genuine issue of material fact." Anderson, 477 U.S. at 247-8 (emphasis in original).
 
 
 9
 Applying this standard to Mr. Mohesky's statement, it is evident that it concerns a material fact, but does not create a genuine issue. Mr. Mohesky's statement is the only piece of evidence, apart from their plerophory, that the plaintiffs offer to prove agency. Mr. Mohesky is not an attorney and a layman's use of a legal term of art such as "agent" is too slender a reed to support a finding that a genuine issue exists in the face of overwhelming evidence to the contrary.
 
 
 10
 The written contract between Cargill and B & D Milling Company clearly states that B & D was an independent contractor. Although an independent contractor can be an agent, see Standard Supply Co. v. Reliance Ins. Co., 49 N.C.App. 613, 272 S.E.2d 394, 397 (1980); Restatement (Second) of Agency, § 14N (1958), a written contract on the subject is conclusive on this issue absent other evidence of agency or course of dealing. Gibbs v. Plymouth Motor Corp., 203 N.C. 351, 166 S.E. 74, 76 (1932). The fact that a Cargill employee visited Barnes' farm to give him advice on how better to take care of the animals is not, contrary to Barnes' suggestion, enough to overcome the presumption in favor of the written instrument. Id.; A.B. Farquhar Co. v. Hardy Hardware Co., 174 N.C. 369, 93 S.E. 922, 924 (1917) ("The plaintiff did not waive its contractual rights, by rendering services gratuitously during the season in the effort to give them perfect satisfaction."). Moreover, the Restatement notes that an independent contractor may be an agent only when he is also a fiduciary, giving the examples of "brokers, factors, attorneys, collection agencies, and selling agencies." Restatement (Second) of Agency, § 14N, comment a (1958). Independent contractors who are non-fiduciaries are non-agents. Id., comment b. Therefore we conclude that the granting of summary judgment on this issue was proper.
 
 B. Implied Contract
 
 11
 The second contract theory on which plaintiffs seek to recover is based on the equitable principle of unjust enrichment, or quantum meruit, upon an implied contract between plaintiffs and defendants. The doctrine of unjust enrichment was devised in order to force the return of benefits received, or payment for them, when it would be unfair for the recipient to retain them without compensation. Collins v. Davis, 68 N.C.App. 588, 315 S.E.2d 759, 761, affirmed 312 N.C. 324, 321 S.E.2d 892 (1984). In such situations, equity implies a contract between the parties; the contract is not the product of any agreement between them. Ellis Jones, Inc. v. Western Waterproofing Co., 66 N.C.App. 641, 312 S.E.2d 215, 217 (1984). However, it is settled law in North Carolina that where two persons contract to furnish goods or services to a third person, the third person is not liable on an implied contract just because he has received such services or goods. Vetco Concrete Co. v. Troy Lumber Co., 256 N.C. 709, 124 S.E.2d 905, 908 (1962); Baumann v. Smith, 41 N.C.App. 223, 254 S.E.2d 627, 632 (1979), reversed on other grounds 298 N.C. 778, 260 S.E.2d 626 (1979).
 
 
 12
 Here, there is no dispute that the plaintiffs contracted with Mr. Warsco through one of his corporate ventures, either H.O.G.S., Inc. or B & D Milling, to raise feeder pigs for the benefit of Cargill. This is exactly the sort of situation in which the North Carolina courts have refused to entertain a quantum meruit action. Therefore, the plaintiffs cannot recover under a theory of implied contract.
 
 II. FRAUD
 
 13
 The plaintiffs also sought relief on the grounds that the alleged representations made to them by Warsco and an employee of Cargill, Leon Calhoun, amounted to actual fraud. The trial court denied Cargill's motion to dismiss this claim, but later granted summary judgment. It rejected the fraud claim as to Warsco because of its finding that he was never the agent of Cargill, and therefore, Cargill could not be responsible for any false representations Warsco might have made. This court agrees.
 
 
 14
 As for the claim involving Calhoun, the plaintiffs said that they asked Calhoun a number of times about the financial condition of Warsco, or B & D Milling, and that Calhoun's answers were favorable, or at least not unfavorable. At the same time, however, Calhoun knew of a consent order entered in a North Carolina Superior Court action, in which both Cargill and Mr. Warsco's company H.O.G.S., Inc. were involved, declaring H.O.G.S., Inc. to be in default on the payment of a large indebtedness and requiring Cargill to pay the production payments and any bonuses it owed to H.O.G.S., Inc. for November, 1985, directly to H.O.G.S.' creditor. Moreover, plaintiffs point to Cargill's alleged knowledge of a $102,861.67 overpayment the company had made to H.O.G.S., Inc. It is undisputed that when Cargill discovered the overpayment, it subtracted the overpayment from the amount it would have paid B & D Milling, by this time the parent company of H.O.G.S., Inc., for work in progress. This debit, along with an unexpected debt of $159,000 to a bank, effectively rendered B & D Milling insolvent in January 1986, leading to the Cargill takeover of the inventory.
 
 
 15
 Under North Carolina law, the five elements of actual fraud are:
 
 
 16
 (1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.
 
 
 17
 Terry v. Terry, 303 N.C. 77, 273 S.E.2d 674, 677 (1981).
 
 
 18
 A mere recommendation or statement of opinion ordinarily cannot be the basis of a cause of action for fraud. Johnson v. Phoenix Mut. Life Ins. Co., 300 N.C. 247, 266 S.E.2d 610, 619 (1981) ( quoting Myrtle Apartments, Inc. v. Lumbermen's Mut. Cas. Co., 258 N.C. 49, 127 S.E.2d 759 (1962)).
 
 
 19
 The trial court ruled that, even assuming that Calhoun's representations were made before Phelps began work for B & D, which is not entirely clear on the record, Phelps failed to show that the representations were in fact false or that Calhoun acted with intent to deceive, since there was no evidence that Calhoun or Cargill was aware of the overpayment to H.O.G.S., Inc. until after Phelps entered into his agreement with B & D.
 
 
 20
 Mr. Phelps and Mr. Barnes both stated in their depositions that they had had business dealings with Dale Warsco in the past and knew that, in Mr. Barnes' words, "he was broke." Mr. Phelps' deposition testimony showed that he knew a great deal about Warsco's business activities, and that "Dale didn't have any money to put up" in a joint venture with Continental Grain Company. This, Mr. Phelps continued, resulted in Warsco's deal with Cargill in which Cargill owned the actual herd and Warsco was to manage it for them.
 
 
 21
 It is thus apparent that Mr. Phelps knew as much about Warsco's solvency, or lack of it, as anybody. Any "deception" on this issue appears to have been self-deception, as these excerpts from Mr. Phelps' deposition indicate:
 
 
 22
 Q. What statements did [Calhoun] make that were false?
 
 
 23
 A. ... I didn't never talk to Leon a whole lot. I weren't in contact with Leon that much.
 
 
 24
 I talked to him one or two times and asked him how Dale's financial--how the arrangement was going between--Cargill and B & D Milling. He said fine, as far as he knew.... And I feel like we were misled at the time.
 
 
 25
 Q. All right. That's my question. What indication do you have that Mr. Calhoun, or anybody else working for Cargill, knew that they were telling you something wrong when they told you that?
 
 
 26
 A. I just, uh, feel like uh, when they put Dale in business that they knew of the overpayment of money ...
 
 
 27
 Asked what evidence he had of this, Phelps answered:
 
 
 28
 A. It's just circumstantial evidence. I mean, I don't....
 
 
 29
 Q. Okay. What evidence? What you've got is a feeling in your gut.
 
 
 30
 A. Yeah.
 
 
 31
 Q. But no evidence?
 
 
 32
 A. I don't have any evidence, no. No evidence.
 
 
 33
 Q. What evidence do you have that ... Cargill knew that B & D wasn't going to be able to make it?
 
 
 34
 A. I don't have any evidence.
 
 
 35
 Q. Are you aware of anybody who does have any evidence?
 
 
 36
 A. No, I'm not.
 
 
 37
 Q. Are you aware of any evidence that Cargill or any of its employees, Mr. Calhoun or anybody else, ever at any time knowingly made a false statement to you or Mr. Barnes?
 
 
 38
 A. No, I don't.
 
 
 39
 We can only conclude, therefore, that the trial court had no choice but to grant summary judgment on Mr. Phelps' claim of fraud.
 
 III. PENDENT STATE LAW CLAIMS
 A. Unfair and Deceptive Trade Practices
 
 40
 The trial court granted Cargill's motion to dismiss the plaintiffs' state law claim of unfair and deceptive trade practices, citing State ex rel. Edmisten v. J.C. Penney Co., 292 N.C. 311, 233 S.E.2d 895 (1977), which held that N.C.Gen.Stat. § 75-1.1, the Unfair and Deceptive Trade Practices Act, was intended to prohibit only those unfair and deceptive practices "affecting sales." 292 N.C. at 317, 233 S.E.2d at 899. The trial court found that the complaint contained nothing to show that the defendant's alleged deceptive acts affected or surrounded a sale, pointing out that no allegations "character[ized] defendant as a seller in its relationship with plaintiffs." Order of June 5, 1987, at 10. The court went on to say: "Plaintiffs' facts essentially concern defendant's alleged intentional failure to pay plaintiffs for their services rendered in the maintenance and raising of defendant's swine."
 
 
 41
 In Edmisten, the North Carolina Supreme Court contrasted the language of N.C.Gen.Stat. § 75-1.1 (1977)[2] with a similar provision in the Federal Trade Commission (FTC) Act, 15 U.S.C. § 45(a)(1),[3] and concluded that the federal court decisions interpreting the word "commerce" in the FTC Act as "expansive enough to encompass all business activities" and "assign[ing] the broadest possible definition to the word 'commerce,' " were inapposite in interpreting the North Carolina statute since the state legislature must have had a more restrictive intent by phrasing the North Carolina act differently from the federal act. 233 S.E.2d at 898. Accordingly, the court continued, § 75-1.1 was intended to prohibit only those unfair and deceptive trade practices involving "bargain, sale, barter, exchange, or traffic." Id. at 899.
 
 
 42
 In response to this narrow interpretation of § 75-1.1, the legislature almost immediately altered the statute's language to mirror that of the FTC Act, at the same time altering subsection (b) to give the legislature's definition of the word "commerce" as including "all business activities."[4] Act of June 27, 1977, ch. 747, 1977 N.C.Sess.Laws 984.
 
 
 43
 Despite this "extremely broad" language, see Bunting v. Perdue, Inc., 611 F.Supp. 682, 691 (E.D.N.C.1985), the North Carolina courts, while retreating from the narrow holding of Edmisten, have continued to rule that the amended statute does not "encompass 'all forms of business activities,' " but is merely intended to see that the intent of the legislature as set out in the original subsection (b) is carried out (this despite the fact that this section has been repealed). See Threatt v. Hiers, 76 N.C.App. 521, 333 S.E.2d 772, 773 (1985), disc. rev. den. 315 N.C. 397, 338 S.E.2d 887 (1986); Buie v. Daniel International, 56 N.C.App. 445, 289 S.E.2d 118, disc. rev. den. 305 N.C. 759, 292 S.E.2d 574 (1982). They have rejected, however, the suggestion in Bunting that the purpose of the statute is primarily consumer protection. 611 F.Supp. 691. In Olivetti Corp. v. Ames Business Systems, 81 N.C.App. 1, 344 S.E.2d 82, rev'd on other grounds 319 N.C. 534, 356 S.E.2d 578 (1987), the North Carolina Court of Appeals stated that "it is also clear that individual consumers are not the only ones protected and provided a remedy [under § 75-1.1]. This is obvious both from the language of the statutes and from the decisions of the appellate courts of this state." 344 S.E.2d at 95 (citations omitted).[5] The original subsection (b) stated that the purpose of the statute was to "provide civil legal means to maintain ethical standards of dealings between persons engaged in business" as well as between businessmen and consumers. N.C.Gen.Stat. 75-1.1(b) (1977) (emphasis added). See Concrete Service Corp. v. Investor's Group, Inc., 79 N.C.App. 678, 340 S.E.2d 755, 760 (1986) ("The statutes ... serve to protect businesspersons as well.").
 
 
 44
 There is no question, of course, that the parties to this action are "engaged in business." And certainly the plaintiffs' allegations, as the trial court summarized them, that Cargill deliberately concocted a scheme whereby they led plaintiffs to believe, untruthfully, that Cargill would see that they were paid for their services in caring for Cargill's swine, would meet the definition of an "unfair" or "deceptive" act.
 
 
 45
 In a case construing the pre-1977 language of § 75-1.1, which has continued to be followed, the North Carolina Supreme Court stated that a practice is "unfair" if "it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Johnson v. Phoenix Mut. Life Ins. Co., 300 N.C. 247, 266 S.E.2d 610, 621 (1980) (citations omitted). (Of course, the Unfair Trade Practices Act is no longer limited to consumers.) The definition the court offered of "deceptive" was circular: "An act or practice is deceptive ... if it has the capacity or tendency to deceive." 266 S.E.2d at 622.[6]
 
 
 46
 Accepting the plaintiffs' allegations as true, as the court must do on a motion to dismiss, it is difficult to see how such practices as they have alleged could be seen as anything other than unfair and deceptive. The trial court, of course, based the dismissal of the complaint on the lack of a buyer-seller relationship between the parties, but under North Carolina case law as it has developed since the amendment to § 75-1.1 this does not appear to be a requirement. See Marshall v. Miller, 302 N.C. 539, 276 S.E.2d 397 (1981) (suit for damages for misrepresentations made about rental property). Even under the former law, the North Carolina courts provided an expansive definition of sales. Johnson v. Phoenix Mut. Life Ins. Co. involved the question of whether the "relationship of borrower and mortgage broker" could be included in the narrow Edmisten definition of commerce as "an exchange of some type." 266 S.E.2d at 620. The North Carolina Supreme Court said:
 
 
 47
 The relationship of borrower and mortgage broker involves [sales]. The broker is manifestly engaged in selling his services in procuring a loan which is most favorable to the needs and resources of the potential borrower, who, in turn, has sought to obtain a broker who can best represent his interests in securing proper financing. While no tangible property of any kind moves through commerce because of this relationship, an exchange of value does occur as the result of this process of securing a broker as the representative of the potential borrower. It is clear, therefore, that the activities of [the broker] with regard to its relationship with [the potential borrower] come within the purview of the statute.
 
 
 48
 Id.
 
 
 49
 Applying the above standard to the present case, it is apparent that an exchange of value was certainly occurring as a result of the plaintiffs' agreement to care for Cargill's swine; like the broker in Johnson they were selling their services. Accordingly, it was error to dismiss the plaintiffs' § 75-1.1 action because the activities complained of did not involve a sale. Furthermore, the dismissal was anomalous in light of the trial court's concurrent refusal to dismiss plaintiffs' fraud claims against Cargill. Proof of fraud is ipso facto proof that § 75-1.1 has been violated. Hardy v. Toler, 288 N.C. 303, 218 S.E.2d 342, 346 (1975); Atlantic Purchasers, Inc. v. Aircraft Sales, Inc., 705 F.2d 712, 715 (4th Cir.1983).[7]
 
 
 50
 We note that counsel for Cargill has attempted to characterize the plaintiffs' § 75-1.1 count as merely alleging breach of contract, which by itself cannot constitute a violation of the statute. See, e.g., Hageman v. Twin City Chrysler-Plymouth, 681 F.Supp. 303, 307 (M.D.N.C.1988). However, plaintiffs' memorandum in opposition to the motion to dismiss contained the specific statement that "Plaintiffs ... are pleading that breach of the alleged agreement is not the basis for Plaintiffs' cause of action under G.S. 75-1.1 but that [it is] the actions of Defendant which taken as a whole demonstrate a cause of action for unfair or deceptive acts or practices." This is indeed the gist of plaintiffs' allegations. See Mapp v. Toyota World, 81 N.C.App. 421, 344 S.E.2d 297 (1986): "Plaintiff's evidence in this case showed not just a breach of promise; it showed a fraudulent scheme, i.e., a contract induced by defendant's promise [which it] never intended to keep." 344 S.E.2d at 301.
 
 B. The Business Opportunity Sales Act
 
 51
 The trial court also dismissed plaintiffs' claims under the North Carolina Business Opportunity Sales Act, N.C.Gen.Stat. §§ 66-94 and 66-94.1 (1988). This statute applies only to "the sale or lease of any products, equipment, supplies, or services for the purpose of enabling the purchaser to start a business" where the seller makes certain representations enumerated in the Act. § 66-94. The trial court pointed out that the complaint alleges that "the plaintiffs were in the business of raising swine before defendant even entered the picture," and therefore, since they were not starting a new business, the Business Opportunity Sales Act could not apply to them. This court agrees, and also notes that Cargill made none of the representations set out in the Act. Dismissal was therefore proper.
 
 IV. CONCLUSION
 
 52
 That part of the district court's Order dismissing plaintiffs' North Carolina Unfair Trade Practices Act claims is reversed. In all other respects, it is affirmed, and the cause remanded for further proceedings not inconsistent with this Opinion.
 
 
 53
 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
 
 
 54
 WILKINSON, Circuit Judge, concurring in part and dissenting in part:
 
 
 55
 I dissent from the majority's treatment of plaintiffs' claim under the North Carolina Unfair Trade Practices Act. Simply put, the majority would permit that statute to swallow up basic North Carolina contract remedies.
 
 
 56
 In response to the North Carolina Supreme Court's opinion in State ex rel. Edmisten v. J.C. Penney Co., 233 S.E.2d 895 (N.C.1977), the North Carolina General Assembly amended N.C.G.S. § 75-1.1(b). The purpose of this amendment was "to ensure that the original intent of the statute ... was effectuated." Threatt v. Hiers, 333 S.E.2d 772, 773 (N.C.Ct.App.1985); Buie v. Daniel Int'l Corp., 289 S.E.2d 118, 119 (N.C.Ct.App.1982). That is, the amendment sought to ensure that this section applied to dealings between buyers and sellers. Threatt, 333 S.E.2d at 773; Buie, 289 S.E.2d at 119.
 
 
 57
 Here, plaintiffs simply failed to allege any facts sufficient to support a claim under N.C.G.S. § 75-1.1. As the district court correctly recognized, plaintiffs alleged no deceptive practices by defendant which involved a sale. No allegations characterize defendant as a seller in its relationship with plaintiffs. Plaintiffs at most have alleged a breach of contract, in that defendant intentionally failed to pay plaintiffs for their services rendered in the raising and maintenance of defendant's swine. A breach of contract does not fall within the purview of N.C.G.S. § 75-1.1, United Roasters, Inc. v. Colgate-Palmolive Co., 649 F.2d 985, 992 (4th Cir.1981); Hageman v. Twin City Chrysler-Plymouth, Inc., 681 F.Supp. 303, 306-07 (M.D.N.C.1988), and I am unable to see how the Unfair Trade Practices Act applies.
 
 
 58
 What this case presents, in essence, is a failure to pay a contractual debt. While breach of contract remedies would surely lie for such a failure, this is not what is commonly understood to be an unfair trade practice. There is nothing "immoral, unethical, oppressive, unscrupulous, or substantially injurious" about defendant's conduct. Johnson v. Phoenix Mutual Life Ins. Co., 266 S.E.2d 610, 621 (N.C.1980), overruled on other grounds, Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 374 S.E.2d 385 (N.C.1988).
 
 
 59
 Even in its amended form, the North Carolina courts have been careful to restrict § 75-1.1 to activity affecting sales. See Threatt, 333 S.E.2d at 773; Buie, 289 S.E.2d at 119. The statute is not intended to serve as an all-purpose watchdog of commercial activities. Otherwise, the carefully developed remedies under North Carolina law for breach of contract, see, e.g., N.C.G.S. § 66-100; § 66-125; § 66-136; § 25-703; § 25-2-711, would be set at naught. In particular, the statute provides a treble damages remedy for breach of its provisions. N.C.G.S. § 75-16. If an expansive interpretation is now to apply, this extraordinary remedy will become available in ordinary commercial transactions. Nothing in North Carolina law persuades me that this was intended.
 
 
 60
 In sum, I believe we should defer to the North Carolina District Court's interpretation of North Carolina law. In this case, that interpretation is eminently sound, and I would affirm the judgment of the trial court in all respects.
 
 
 
 [1]
 The trial court dismissed plaintiff Phelps' breach of contract claim based on defendant's submission of two release forms, dated November 20, 1985 signed by Phelps and Warsco, which state in part:
 The undersigned acknowledges and agrees that any contractual relationship for the further production of the said herd owned by Cargill, Inc., shall be between the undersigned and B & D Milling Company, Inc. It is further agreed that Cargill, Inc. shall have no obligations for monies presently owed the undersigned or that may hereafter accrue for the production or boarding of said animals.
 The trial court found that this clause barred Mr. Phelps from recovery based on a contract theory. This court concurs, noting, however, that the discussion which follows applies as much to Mr. Phelps as it does to Mr. Barnes.
 
 
 [2]
 N.C.Gen.Stat. § 75-1.1 (1977), now repealed, read:
 (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.
 (b) The purpose of this section is to declare and to provide civil legal means to maintain ethical legal standards of dealings between persons engaged in business and the consuming public within this State, to the end that good faith and fair dealings between buyers and sellers at all levels of commerce be had in this State.
 
 
 [3]
 The FTC Act, 15 U.S.C. § 45(a)(1) (1987) reads: Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful
 
 
 [4]
 The statute in its amended, and current, form reads:
 (a) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.
 (b) For the purposes of this section, "commerce" includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession.
 N.C.Gen.Stat. § 75-1.1 (1985).
 
 
 [5]
 The court also said that it found the analysis in Bunting "distinguishable and unpersuasive on this issue." 344 S.E.2d at 95
 
 
 [6]
 The Johnson court did state that "[t]he broad language of the statute indicates that the scope of its concept and application is not limited to precise acts and practices which can be readily catalogued. What is an unfair or deceptive trade practice usually depends upon the facts of each case and the impact the practice has in the marketplace." 266 S.E.2d at 621 (citations omitted)
 
 
 [7]
 In Pearce v. American Defender Life Ins. Co., 316 N.C. 461, 343 S.E.2d 174, 180 (1986), the court recognized that "[i]t is axiomatic that proof of fraud itself constitutes a violation of the prohibition against unfair or deceptive trade practices" adding that under the facts of the instant case, which involved both N.C.Gen.Stat. § 75-1.1 and § 58-54.4 (defining unfair and deceptive practices in the insurance industry), a plaintiff need only show some of the elements necessary to make out a fraud case: (1) that there were statements that had a capacity or tendency to deceive; (2) reliance; and (3) actual damages. 343 S.E.2d at 1788-9. It is not necessary to prove actual deception, or even that the statements made were untrue ("Even a truthful statement may be deceptive if it has the capacity or tendency to deceive"), and the question of whether the defendant acted in bad faith is irrelevant. Id. at 178